Good morning, may it please the court. My name is Susan Hill and I represent the petitioner, Ms. Rina Hovhannisyan. Ms. Hovhannisyan should have been granted asylum and withholding of removal is defined under both the Act and the Convention Against Torture. Can I take you right to the chase? Sure. In terms of, I think that we're all familiar with the facts, but there are two areas in the adverse credibility findings that I have concerns about and that I would like your best argument on those. And the two incidents I'm thinking about is the one where there were people that came in and the son was removed and the husband was beat up and the daughter was sexually assaulted. And then the discrepancy that concerns me that I can see in the record is in one instance your client said she was there and in the other instance she said she comes home after. And I want to know why that isn't significant from the standpoint that, let's take it from a mother's perspective where your son's pulled out of the house and removed. Wouldn't you know whether you were there or not or you came later? And in the other credibility instance that the daughter being able to return to Armenia, and my understanding of the daughter, and you can possibly help me on this, is that, well, their concern for persecution had to do with the father's ethnicity in terms of the Iranian part of it. Isn't the daughter half Armenian and half Iranian then? And why doesn't she have this? And your client's claiming her problems are because she's married to an Iranian. Why wouldn't the daughter returning being of that ethnicity be an indication that people can now return? Yes, Your Honor. With regard to the first question as to the discrepancy, the judge didn't note that discrepancy in his oral decision. He might, I don't recall, but he may have just referenced it in passing. During testimony it was not pointed out to her. She was not given an opportunity to explain if that discrepancy did indeed exist. Perhaps it was just the single sentence that she said where she misstated a pronoun.  Who knows? But the fact of the matter is that because the judge did not focus on that in his oral decision, she was not given an opportunity to be put on notice to correct the error in front of the judge, nor in front of the Board of Immigration Appeals did she have opportunity to address that since it was not a significant factor in the judge's decision. So on the record, I'm unable to address that because the record simply doesn't have any evidence one way or the other as to any explanation. But you would concede that the record does show in one instance she says she was there, in another instance she says she got there after he'd been abducted? To tell the truth, Your Honor, I can't because, as I said, it wasn't pointed out below, and I truthfully didn't even notice that when I was reviewing the facts. So I was prepared to talk about other discrepancies that were pointed out by the judge or in the briefs, but to be honest, I wasn't aware that that existed. And again, I go back to that because it wasn't pointed out, there's no opportunity to address it and discuss it here. As far as the daughter, Lilith, being of mixed ethnicity, it does not appear on her birth certificate like it did on her father's birth certificate, and unlike here in the United States, Armenians seem to rely on their birth certificates far more than we do here. Additionally, it's not clear whether anyone knew that she was of mixed ethnicity. She just happened to be in the home when the persecutors came and attacked Ms. Hovhannissian and her husband. Again, Lilith moved to a remote part of Armenia. She doesn't, on paper, have a connection to her mother and father as far as being of mixed descent because it's not clear. Again, because the father was of mixed ethnicity and it did appear on his birth certificate, Ms. Hovhannissian testified that it was not in Lilith's birth certificate, or at least not as obvious, and therefore that's the only reason she could presume why Lilith did not perhaps have been discovered as of the point when the testimony took place. Furthermore, as Ms. Hovhannissian said, it's difficult to receive communications from Armenia, and she's only received two letters from her daughter, and all the record says is that the daughter indicated, do not worry about me. That's not specific evidence that the daughter is safe. All the daughter said was don't worry. So again, it's not clear whether the daughter truly is living without problems in Armenia. But she went back there on her own, right? She went back there because she didn't like living in Russia. And the country, it wasn't specifically addressed, but I believe the country reports indicated that Russia also has its ethnic problems, and that's why many people do not relocate there. But the husband has relocated to Moscow. Right, the husband did relocate. However, she has not had much communication with him either, so it's, again, unclear whether he is having any problems. Even assuming that we were to agree with you about the issue of credibility and the credibility finding, where would that leave your client? Would we be allowed to reach this issue of future persecution or not? Do we have to send it back to the agency from Governor Ventura? Your Honor, I believe the court can reach it because the judge, as it was pointed out in the briefs, he didn't make a specific adverse credibility finding, but at a minimum he pointed out problems with the evidence. And we have rebutted those problems with the evidence, and the judge had opportunity to determine whether she sufficiently established a claim for asylum. He ultimately decided she had not. And, again, the BIA had opportunity to determine whether that evidentiary burden had been satisfied. So I would argue that the issue has been determined and that this court does have jurisdiction to render a separate decision on that issue. Now, in this instance, I presume that the IJ gave the decision orally at the conclusion in the presence of the parties. That's what the record shows. And the finding is, after reciting her testimony about the events surrounding the removal of her son from the home, he says the respondent's application for asylum tells a different story in fact, time, and sequence. Now, that is an accurate summary of the application and the testimony, is it not? Yes, it is, Your Honor. And you're telling us that everybody kind of overlooked that all the way along? Yes, Your Honor. He recited that in his oral decision, but he did not lend any analysis to it. And, moreover, during testimony, he did not question her about it. It was not brought to anyone's attention. And it is possible that during testimony things are happening and not all at once. Now, we would, in order for you to prevail, we would say, we would have to say, in spite of this record and what the IJ said in the presence of these parties in the course of our conclusion of this hearing, that we would have to say, as a matter of law, he is compelled to believe her, has no choice but to believe her. No, Your Honor, I'm not saying that. Well, how can we get to the point where we can conclude that this record is inadequate to put this issue of credibility in full focus? That's all you really have, is it not? Yes, Your Honor, because in order for the judge to find her incredible, she needs to be given an opportunity to explain any discrepancies that the judge may have found. And she was not given that opportunity during testimony. Once the oral decision is rendered, the parties are not allowed to make comments during the oral decision and the evidentiary portion has been closed. And the judges always say you may take it up on appeal. Very well. I'd like to reserve the remainder of my time for rebuttal. You may do that. We'll hear from the government. Good morning, Your Honors. Patricia Smith representing the Attorney General, Alberto Gonzalez. The record evidence in this case does not compel reversal of the immigration's determination, which is in accord with the asylum officer's finding of Petitioner's credible fear interview. Counsel, let me ask you a question about what our cases say about credibility determinations. It seems to me that our case law is that if an IJ gives insufficient reasons for an adverse credibility determination, we reverse that, which focuses on the reasons given rather than on whether there is other evidence that could have been relied on. For example, let's suppose a person testifies in a contradictory way but they're believed anyway. We don't go around reversing that. In other words, we rely on what the IJ did. And if there are ten discrepancies but the IJ relies on only one, don't we have to go with the one and either it stands or falls on what the IJ actually said? The cases from this Court, Your Honor, indeed have looked at what the basis for the IJ's or if the BIA has ruled what the basis for their decision is and looked to that, as opposed to other outside factors. That's correct, Your Honor. Okay. So what we have to figure out is exactly what the IJ relied on and whether that was an adequate factor. And it seemed that the IJ relied primarily, if not exclusively, on that the 64, that the applicant in the application, she doesn't know what happened to the son. She thinks he disappeared. Yet in her testimony, she says she has communication later that he's serving in the military. And that's really the only specific discrepancy that is pointed to. I would disagree with that, Your Honor. There are several discrepancies that are pointed to. And as the other judge recognized, the IJ specifically said her asylum application was very different from what she had indicated at her hearing. In addition to there being discrepancies relating to the issue of when her son was purportedly taken, as well as whether she knew what happened to her or not, there were discrepancies relating to whether or not her daughter was raped. There were discrepancies relating to whether her husband was fired or whether he just went into retirement because he was past the age of 65. These are discrepancies that you say the IJ specifically pointed to? Yes, Your Honor. Because what the IJ does is he goes through her hearing testimony, and then he talks about her asylum application, and he says it tells a completely different story. And then further on in his analysis, he also discusses discrepancies. I see what you're saying. It's consistent throughout that he goes through various areas. He also indicates discrepancies between when the daughter and the father left Russia, whether it was before or after the petitioner, and also whether she told her testimony relating to whether the American consul official asked her about her reasons for coming to the United States. All of those were issues related to discrepancies. He also looked at the State Department report and found that the State Department report was contradictory to what her claim was. And that's also a very significant issue here. With respect to the State Department report, petitioner seems to suggest that the petitioner's husband is a Zairi, but that was not part of the record below. I mean, it was consistently that he was targeted because he was Iranian. What the State Department report talks about, and the IJ relied on, is that there is an overall policy of ethnic tolerance in Armenia, except with respect to the Zairi group. Now, petitioner suggests in her report that it should have been reasonable for the IJ to conclude that there was some imputed Zairi nationality here. That's just not the case. I mean, the testimony was her husband was Armenian, his father was Armenian, his mother was Iranian, but of Armenian descent. He was Christian. But the one statement the State Department report provides about Armenian is that they are from, that they're Turkish, they're Muslim and Turkish speaking. Nothing at all to do with what petitioner is here. So the State Department report is completely contradictory of there being a claim here that nationalists go against Iranians in Armenia. Well, let's say if the adverse, let's say if we found that the adverse credibility finding was not supported by substantial evidence. What's your position about the second prong here on the country conditions? Well, I think we didn't get to the issue of, I don't think the IJ got to the issue of asylum and withholding. So when we're talking about the State Department report, I'm not talking about in terms of country conditions. I'm just talking about in terms of credibility. So the IJ didn't get to the issue of asylum and withholding because he didn't find her testimony credible. So if the court were to reverse the credibility finding, then the court would need to remand it for the board to address the other issues in terms of whether eligibility for asylum or withholding was met. But if Your Honor is talking about the issue which you had raised with Petitioner. So you have a different position on that than what Appellant's Counsel does on that. I understood her to say that we can reach the whole thing. Right. And it's our position, Your Honor, that you cannot because the IJ's finding was clearly based on his finding that she wasn't credible. He did not assume credibility and, therefore, reached the issues of asylum or withholding. The IJ does, however, discuss the fact that the Petitioner's daughter was able to return to Armenia. And we think the record clearly shows that. Even though in the brief Petitioner suggests she was in hiding in the mother's hometown of Ararat, there's nothing in the record to support that. What the record says is that she's been there. She wasn't able to go back to the city where she had grown up, the capital of Armenia. But she was living with a cousin in this town. The Petitioner's husband had also lived there for 10 months without any incidents as far as we know. So there's no evidence in the record whatsoever that she has a problem living there. So we think it's – and that the IJ kind of looked at in terms of – or we think is relevant in terms of the issue of Convention Against Torture. Would the Petitioner more likely not be subjected to torture if she returned? And the Petitioner's own testimony was that she didn't know what would happen. She suggested maybe the nationalists would find her there. So there's no evidence in the record with respect to the Convention Against Torture which the IJ actually looked at apart from credibility. Although we think his credibility findings would be sufficient to also reject the Convention Against Torture claim. The issue of the fact that her daughter is there, is living there. The husband was able to live there for 10 months. How did those factor into credibility? How did the IJ use the daughter returning? Was that part of the credibility? Not in terms of the inconsistency, really. I mean, he discussed it, but it was not really in terms of credibility. Now the incident with her son then, that seemed to be a focus of the credibility. That was the focus of the credibility. And he found the discrepancy in dates. Correct. And I think counsel for the appellant has indicated that – about opportunities to respond and explain. How, you know, how do you see the inconsistencies that he found in the sons and the opportunities to explain? The court's standard of review in terms of looking at the credibility findings is to say, did the IJ cite specific cogent reasons that are supported by the record? And here we would say that is the case. Petitioner was given a full opportunity to present a credible claim, and it's the petitioner's burden to present a credible claim. Petitioner here failed to do that. There wasn't discussion of the different dates in terms of the asylum application said one thing, she said it at something else at the hearing. She was asked not, you know, well, you said such and such in your asylum application, but you're saying this here. But she was asked, well, you know, is that the date? You know, and she repeated it a second time, the difference in date that she was providing. Now, what do we do about the fact of whether she was there when it happened or whether she came later? How does – can we consider that? I think so, Your Honor, and that relates to the date issue because in her asylum application what she had said was that the – related to the fact that she wasn't there, that her husband was beaten and she wasn't there. In her testimony it said she was there. Her husband was beaten and her son was taken. So it is all interrelated. It was all relied on by the IJ in terms of him pointing out the differences between saying it's all different in terms of fact, timing, and claim with respect to the asylum application in her testimony at the merits hearing. You said there was a discrepancy about whether the daughter was sexually assaulted or not. What was that discrepancy? In the asylum application the petitioner indicated that she was raped. In the – at a hearing testimony she indicated that she was beaten. When the petitioner's own counsel asked her was your daughter sexually abused, she indicated she had no knowledge with respect to that. So she was, again, given the opportunity to talk about the fact that in her asylum application she had said the daughter was raped, and here she was saying she didn't know what happened to her. So there was – So she didn't say she wasn't raped, but she said her daughter didn't tell her that she was? She said, I don't know, whereas in her application she had said she was raped, which we think is a very significant difference and would certainly go to the heart of her claim that her family and herself were persecuted because of her husband's Iranian descent. You know, one case you're saying your daughter was raped and you're saying your son was taken away, you don't know where he went. Next time at the hearing you're saying, no, my daughter wasn't raped, and, well, actually my son was taken to the military and conscription is a required part of Armenian society. So the stories are very different. And EIJ pointed to those as well as the difference between what the State Department indicates and what her testimony was with respect to Iranians having a problem in Armenia. Well, now, our cases say that some discrepancy in dates are not all that important. That's correct, Your Honor. And our cases say if the petitioner doesn't have a chance to explain the discrepancy, sometimes they're home free too. And all we have in this case is a direct reference to the disparity in dates. She was never, and I think counsel was right, she was never given an opportunity to reconcile the assertions on one occasion that she was present when her son was taken, and on another occasion in her testimony she's saying she was not. Now, if she'd have been confronted with that and given an opportunity to explain and couldn't, this would be a totally different case. On the other hand, if she could have explained it, it would have neutralized the whole subject matter because the dates really are not all that crucial. They don't advance her cause one way or another. But this event that she tries to describe is extremely significant, at least from my perspective. I think the cases the Court may be referring to in terms of minor discrepancies in date are not relevant here because these are major discrepancies. They're not minor. With respect to whether you are there and the date that your husband is purportedly beaten and your son is taken away, and a date where purportedly – I'm sorry. In the first, the husband is just beaten and you're not there. In the second, her testimony being her son was taken away and her husband was beaten are very significant. But there may be an – excuse me. There may be an explanation. She was given an opportunity. I mean, her counsel asked her a question. She was given a full opportunity to present a credible claim, and she failed to do that. The Court has sometimes looked at inconsistencies in terms of talking at minor discrepancies and can you explain it. IGs consistently talk about the many differences that exist between a Petitioner's testimony and a final application, and they don't in every instance and have not been required to, with every single incident, say to the Petitioner, okay, well, here's the difference. Explain that to me. The question really is, was the Petitioner given an opportunity to present her case and explain? And are the reasons given by the IJ specific and cogent? And here we would argue they are. Okay. Thank you, counsel. You've exceeded your time. Ms. Kill, you have some time remaining, and the government got some extra, so we'll give you what you need on rebuttal. Thank you, Your Honor. Your Honor, with regard to the discrepancies, whether the IJ noted them, whether he did not, it's the adjudicator who ultimately is determining, making the final decision on her case, and if the adjudicator does not understand the testimony, if the adjudicator determines there's a problem with the testimony, the adjudicator must bring it to the party's attention. Just because she has a counselor who can be asking her questions doesn't mean that has been a discrepancy or a misunderstanding in the evidence. They cannot guess as to what the judge is thinking. And in his decision, the judge did not fully analyze any of his remarks in passing as to the asylum application, telling a different timeline, so on and so forth. Additionally, the judge did make a detailed analysis of the country conditions and why he did not think that they supported Ms. Hovenessian's claim. He went into great detail as to whether or not Mr. Karapetian or a person of Iranian descent could be persecuted. Therefore, he has made a decision regarding the strength of the asylum claim, and this court does have jurisdiction to overturn that decision if it chooses. And finally, whether the daughter Lilit was, in fact, raped or not, or whether Ms. Hovenessian was able to say she was, Ms. Hovenessian sufficiently explained the reason before her conclusion in her application. She wrote, my daughter was raped. And then in testimony, she said, I'm not sure. She was in this room with men. They wouldn't allow us in there. When I asked her what happened, she burst into tears. She refused to go see a doctor. That's further, it's context as to what really did happen to Lilit and why Ms. Hovenessian was raped. So on that, she was allowed to explain your saying? She was asked, was your daughter, I don't remember the exact question, but she did explain in testimony, as I recall, that her daughter cried when Ms. Hovenessian asked her what happened. But now, did the IJ say after that that the IJ considered that significant, that she, that there was a discrepancy with whether she was raped or whether she might not have been raped? I don't recall the IJ having a particular problem with that. I truly don't remember. If it was, I would have put it in a specific section of the brief. Do you have other questions? Okay. Thank you very much, counsel. We appreciate the arguments from both parties. And the case just argued is submitted. We will move next to Tirasion v. Gonzales. Thank you.
judges: Leavy, Graber, Callahan